## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JAMIE L. ADAIRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-3149 |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Jamie L. Adaire appeals pro se from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c .  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Adaire has filed a Motion for Summary Judgment (d/e 19), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e21).  The District Court referred this matter for a Report and Recommendation.  Text Order entered April 5, 2013.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

STATEMENT OF FACTS

Before the Initial Decision

Adaire was born on February 22, 1967.  He completed high school and worked as a psychiatric aide, hotel clerk, and laundry worker.  Certified Transcript of Proceedings Before the Social Security Administration (d/e 17) (R.), at 32, 813.[1]  He last worked at substantial gainful activity in 2002.  R. 626.  Adaire has scoliosis and underwent a spinal fusion surgery when he was 15 years old.  R. 507.  Adaire also suffers from right cubital tunnel syndrome (post-surgery), migraine headaches, depression, anxiety, and somatization disorder.  R. 626.

On or about January 18 2000, Adaire was in an automobile accident.  On January 22, 2000, Adaire saw Dr. Michael Wilson, M.D., at Prompt Care in Springfield, Illinois, complaining of pain after the accident.  On examination, Dr. Wilson observed muscle spasms in the left paravertebral, thoracic and bilateral cervical musculature.  Adaire had full range of motion at the neck and waist.  Dr. Wilson observed minimal tenderness in the right thoracic and lumbar area.  The rest of the examination was normal.

---

[1]  The transcript of the June 26, 2007 evidentiary hearing was filed separately as an exhibit to the Commissioner's Memorandum in support of her Motion for summary affirmance.  Commissioner's Memorandum In Support of Motion for Summary Affirmance (d/e 22), Exhibit 1, Supplemental Certified Transcript of hearing held on June 26, 2007, R. 828-60. The remainder of the Transcript is filed at docket entry 17.

Imaging showed no instability in the rods in his back and no acute abnormalities.  R. 507, 509.

On April 26, 2000, Adaire saw an orthopedist, Dr. John R. Fisk, M.D. R. 512-13.  Adaire reported less pain and had almost normal range of motion in his back.  Adaire reported that his back pain was "95% better" and said that he wanted to work full-time.  The records indicate that Dr. Fisk advised normal activities and provided a note that Adaire could return to work.  R. 513.

On August 3, 2000, a state agency physician Dr. Julio M. Pardo, M.D., completed a Functional Capacity Assessment.  R. 522-29.  Dr. Pardo opined that Adaire could lift fifty pounds occasionally and twenty-five pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; could perform unlimited pushing and pulling; could occasionally climb, stoop, and crouch; and could frequently balance, kneel, and crawl.  R. 523-24.

On March 15, 2004, Dr. Julio Vijil, M.D. performed cubital tunnel release and ulnar nerve transposition surgery on Adaire's right elbow.  R. 542-44.  Previous nerve conduction studies confirmed severe right cubital tunnel syndrome.  Dr. Vijil reported that Adaire tolerated the surgery well and there were no complications.  R. 543-44.

On April 12, 2004, Adaire saw Dr. Fisk.  R. 530, 542.  Adaire reported intermittent back pain.  Adaire stated that he felt stiff all day, and the pain was worse at night.  He denied that the back pain radiated into his extremities, but reported jumpiness in both arms after the right elbow surgery.  On examination, Adaire did not appear to have any pain or discomfort, moved with ease, had a normal gait, and could bend forward to about 50% flexion with limited side and back bending.  R. 530.  Adaire reported discomfort with light brushing of the skin on his back and pain with rotation of his arms.  R. 530.  Dr. Fisk opined that Adaire may have exaggerated his pain response.  Dr. Fisk stated, "Jamie appears to me to have an inappropriate affect.  He does not appear to exhibit significant painful behavior but is here complaining of chronic pain.  He is difficult to evaluate."  R. 530.

On May 26, 2004, Adaire saw a neurologist Dr. Joshua Warach, M.D. R. 532-33.  Adaire reported constant back pain that radiated into both hips and both legs.  Adaire also reported that since his elbow surgery, the pain in his right elbow has been worse and he had had weakness in his right arm.   Adaire reported that he was on medication for depression.  Adaire denied having any homicidal or suicidal ideations.  R. 532.

Adaire's mental status examination was normal.  Dr. Warach observed that Adaire's gait was slow and tentative, placing less weight on the right leg; he had significantly reduced motor strength in his right arm and leg, and giveaway in his right leg; he had "clumsy" right hand functioning; and he had some atrophy of his right interossei muscle, but no abnormal involuntary movements.  The Tinel's and Phalen's signs were negative in both wrists.  R. 532-33.

Dr. Warach assessed right hemiparesis with giveaway, a clumsy right hand, and gait difficulty; history of thoracic, lumbosacral, and leg pain; history of right shoulder and elbow pain; and history of depression.  Dr. Warach noted, "Psychogenic factors may be highly contributory to his symptoms."   R. 533.  Dr. Warach recommended an MRI of the spine, and a follow up with Dr. Fisk, a referral to a pain management specialist, and a psychiatric consultation for depression.  R. 533.

On June 4, 2004, Adaire saw a pain management specialist Dr. Roger Traycoff, M.D.  Dr. Traycoff noted that Adaire had an "unusual affect with nonphysiological sensory loss in the right arm and scapular region." R. 539.  Dr. Traycoff stated that, "multiple inconsistencies were noted on physical examination, i.e. marked impairment of function of the right upper extremity on examination; near normal function when observed after he left

our office."  R. 539.  Dr. Traycoff diagnosed chronic pain syndrome, cervical stenosis with mixed radiculopathy and myelopathy, thoracic disc herniation at C7-T1 and T1 radiculopathy, and somatoform disorder.  R. 539.  Dr. Traycoff recommended conservative therapy with analgesics.  Dr. Traycoff opined that Adaire was not a candidate for neuroblockade because of his abnormal illness behavior.  R. 539.

On June 7, 2004, Adaire underwent an MRI of his spine.  The MRI did not indicate any evidence of stenosis or disc herniation, but showed neural foramina at C4/C5 and C5/C6.  The C7/T1 level could not be evaluation because of the metal artifacts left from the prior back surgery. R. 595.

On June 24, 2004, Adaire saw Dr. Warach.  Adaire reported continued back pain that radiated into his right leg.  Dr. Warach observed that Adaire moved slowly, but moved all four extremities equally well.  Dr. Warach could not assess motor strength because of "difficulty with cooperation."  R. 591.  Dr. Warach noted that Dr. Fisk had noted an exaggerated pain response.  Dr. Warach noted, "I am concerned that psychogenic factors may be highly contributory to [Adaire's] multiple symptoms and presentation."  Dr. Warach recommended a referral to the Southern Illinois School of Medicine Department of Neurology for an

opinion and neurologic management.  Dr. Warach directed Adaire to avoid heavy lifting.  R. 591.

On June 28, 2004, Dr. Paul Smelter, M.D., wrote a letter to the Illinois Department of Human Services.  R. 610.  Dr. Smelter wrote that Adaire had right arm pain and weakness and back pain.  Dr. Smelter wrote that due to the severity of his condition, Adaire was "limited in the use of his right arm, which prevents working and requires assistance in care of his child."  R. 610.

On June 24, 2004, a state agency psychologist, Dr. Linda Lanier, Ph.D., performed a consultative examination.  R. 545.  Adaire's father, R.C. Hill, also attended the examination.  Adaire reported having a learning disability and a history of special education.  Adaire reported that he lacked the concentration to enjoy reading for pleasure.  Adaire reported that he worked for fourteen years as an assistant for SPARC, an agency that provides services to individuals with disabilities.  He also reported that he also had some vocational training in radio broadcasting.  R. 545.  Adaire reported that he did not engage in any social activities.  He had a driver's license, but seldom drove.  Adaire and his father reported that Adaire left home about once a month.  R. 546.

Dr. Lanier described Adaire as a "vague historian."  R. 546.  Adaire reported depressive symptoms and manic episodes.  Adaire reported seeing things out of the corner of his eye.  He also reported frequent panic attacks.  Adaire reported that he had problems in social situations and was fearful of leaving home.  Adaire's father stated that Adaire had problems with social anxiety, depression, memory, irritability and pain.  Adaire and his father stated that Adaire needed assistance with dressing and bathing, and could not write.  R. 546.

Dr. Lanier observed that Adaire was insightful and articulate. Adaire's affect was constricted with mild and anxiety and sadness as the predominant emotions.  He became mildly tearful and sometimes circumstantial in his reasoning, and he showed some delusional thinking with respect to fears, concentration difficulties and limited memory functions.  R. 546-47.  Dr. Lanier stated that Adaire was "diagnostically complex" with an uneven distribution of cognitive skills.  R. 547.  Dr. Lanier diagnosed major depression due to medical condition, panic disorder with agoraphobia, R/O somatization disorder, and low intelligence with strong expressive language skills but many areas of deficit functioning, especially short term memory.  R. 548.

On August 3, 2004, a state agency psychologist Dr. Galassi-Hudspeth, Psy.D., prepared a Psychiatric Review Technic Form and Mental Residual Functional Capacity Assessment.  R. 549-52, 561-74.  Dr. Galassi-Hudspeth opined that Adaire suffered from depression secondary to his medical conditions, anxiety, and somatoform disorder.  R. 564, 566-67.  Dr. Galassi-Hudspeth opined that Adaire's mental impairments caused mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  R. 571.  Dr. Galassi-Hudspeth opined that Adaire could understand and perform simple, rote routine work tasks, but would have difficulty with more complex ones, and could relate to coworkers and supervisors, but might find working with the public stressful.  R. 551.

On August 5, 2004, a state agency physician Dr. Towfig Arjmand, MD., completed a Residual Functional Capacity Assessment.  R. 553-60.  Dr. Arjmand opined that Adaire could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit six hours in and eight-hour workday; was limited in his ability push or pull with his upper extremities due to weakness in his right upper and lower extremities; could never climb; could occasionally balance, stoop, kneel, crouch, and crawl; was limited in his ability to handle

and finger with his right hand; and should avoid concentrated exposure to hazards, such as machinery or unprotected heights.  R. 553-60.

On September 28, 2004, state agency physician Dr. Frank Jimenez, M.D. completed a Residual Functional Capacity Assessment.  R. 583-90. Dr. Jimenez opined that Adaire could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six hours in an eight-hour workday; could sit six hours in and eight-hour workday; was limited in his ability push or pull with his right upper extremity due to weakness in his right arm; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; could occasionally handle and finger with his right hand; could never reach overhead with his right arm; and should avoid concentrated exposure to hazards, such as machinery or unprotected heights.   R. 583-90.

On January 15, 2007, Dr. Smelter completed a medical source statement.  R. 618.  Dr. Smelter opined that Adaire could occasionally lift ten pounds and frequently lift about five pounds; was not limited in standing, walking or sitting; was limited in pushing and pulling with his right arm; could occasionally climb and frequently balance, kneel and crouch; could never crawl; and was limited in reaching, handling and fingering with his right arm and hand.  R. 618-20.

On June 26, 2007, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 828-60.  Adaire appeared in person and with his attorney.  A vocational expert Dr. James E. Lanier, Ph.D., also appeared at the hearing.  R. 830.

Adaire testified first at the hearing.  He was unmarried, and had three children ages 18, 9 and 5 years old.  He was right handed.  He lived in a house with his girlfriend and his two younger children.  His girlfriend was also the mother of the children.  R. 832.

Adaire testified that he completed high school and started college, but did not complete the first year.  R. 834-35.  Adaire testified that he could read, but not write.  He testified that he last worked in 2002 for SPARC.  R. 835.  He answered phones, set up appointments, drove individuals to appointments, and assisted in cleaning individuals' homes.  R. 837.  He testified that he left the job because he was getting weak and in pain.  He testified that his pain and weakness got progressively worse after the car accident in 2000.  He testified that he was not able to stay on task and was falling asleep on the job.  R. 838.

Adaire earned some income in 2004 working for the Coalition for Community Services.  R. 835.  Adaire testified that he tried to participate in

a program that the agency operated, but could not because he missed too many days.  R. 836.

The ALJ asked Adaire what problems were keeping him from working.  Adaire testified that he had problems with pain and weakness. He testified that he had pain in his back, legs, and arm.  He also testified that he had migraine headaches.  He testified that his pain medications caused dizziness, sleeplessness, and blurred vision.  R. 838-39.

Adaire testified that he had back pain all the time.  He testified that the pain radiated into his right leg.  R. 847.  He testified that he could not use his right hand after the surgery on his right arm.  He testified that his right hand was "clawed together."  R. 848.  He could not pick up small objects such as coins.  He testified that he could not lift his right arm above his head.  R. 848.

Adaire testified that he had migraine headaches about four times a week.  The headaches made him sensitive to light and sound.  He testified that he had to lie down and take his medicine.  He testified that the headaches affected him "[p]retty much all day."  R. 849.

Adaire testified that he also suffered from depression.  He testified that he was taking medication for depression prescribed by his Dr. Smelter, but he had not seen a psychologist or psychiatrist.  R. 839.  Adaire testified

that he did not leave the house very often.  R. 850.  He also testified that he had problems with his memory.  He testified that he tried to have people write things down for him.  R. 853.

Adaire testified that the time that he got out of bed in the morning varied anywhere from 6:00 a.m. to 10:00 a.m.  He did not watch the children while his girlfriend went to work.  His girlfriend worked varying shifts at a hospital.  R. 840-41.  He testified that his aunt watched the younger children during the school year and his eldest son watched them during the summer.  R. 841-42.  Adaire testified that he did not do housework or prepare meals.  He also did not do grocery shopping.  R. 843.  He spent most of his time watching television and napping.  He also sometimes read if he "can keep focused on it."  R. 843.   Adaire had a driver's license.  R. 843.  Adaire did not engage in any outside activities.  R. 844.  Adaire testified that he needed assistance to dress and bathe himself.  R. 844, 849.

Adaire testified that he could stand for five or ten minutes, sit for twenty to thirty minutes, and could only lift less than five pounds.  He testified that he could not use his right arm to do anything.  R. 851-52.  He testified that he could not bend, push, pull, or reach.  R. 852.

The vocational expert Dr. Lanier then testified.  The ALJ asked Dr.

Lanier the following question:

> I would like you to assume an individual who is 40 years old with a high school education, past relevant work as described, an individual who would be limited to light and sedentary work with the following exceptions.  No jobs which would require climbing or working at unprotected heights, no jobs which would require over-shoulder work.  No jobs which would require repetitive bending or stooping.  And jobs which are unskilled, routine, repetitive types of work.  How would these restrictions affect the performance of the past relevant work?

R. 853-54.  Dr. Lanier opined that the person could not perform Adaire's

past relevant work, but could perform the following jobs:

> Surveillance System Monitor—and these are sedentary—5,400.  Ticket Checker, 3,025.  Information Clerk, 4,436.  Some light work, Order Clerk, 7000.  Information Clerk, 3,327.  Ticket Seller, 8,000.  And the last one, Small Package Delivery, 6,500.

R. 854.  Dr. Lanier testified that the numbers he quoted were the number of

these jobs that existed in Illinois.  R. 854.   Dr. Lanier testified that the jobs

listed did not require kneeling or crawling.  Dr. Lanier also testified that he

did not include any jobs that required rapid, repetitive hand-finger

movements.  R. 854.

On examination by Adaire's attorney, Dr. Lanier testified that the

listed jobs could be performed with either hand and did not necessarily

require use of the individual's dominant hand.  R. 855.  Dr. Lanier testified

that the sedentary jobs he listed could be performed if the individual had to change at-will from sitting to a standing position throughout the workday. R. 856-57.  Dr. Lanier also testified that the individual could still perform the sedentary jobs listed if he was limited to occasionally lifting up to ten pounds and walking less than a block.  R. 858.

Dr. Lanier testified that the individual could perform the jobs listed if he had moderate limitations in concentration, persistence, or pace, but could not work if he had marked limitations in concentration, persistence or pace.  R. 859.   Dr. Lanier also testified that a person could not perform the jobs listed if he had to lie down more often than during a lunch break.  R. 859.  The hearing was then concluded.

<u>The Initial Decision of the ALJ</u>

On July 23, 2007, the ALJ issued her initial decision.  R. 624-34.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless

of the claimant's age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Adaire met his burden at Steps 1 and 2.  He had not engaged in substantial gainful activity after July1, 2002, and he suffered from severe impairments of "scoliosis (post fusion surgery in 1983), cubital

tunnel syndrome (post-surgery), headaches; depression, anxiety and somatization disorders.  R. 626.

At Step 3, the ALJ found that did not have an impairment or combination of impairments that met a Listing.  The ALJ considered Listings 1.02 (major dysfunction of the joints), 1.03 (reconstructive surgery of a major weight-bearing joint), 1.04 (disorders of the spine), 12.04 (affective disorders including depression), 12.06 (anxiety disorders), and 12.07 (somatoform disorders).  R. 627.

At Step 4, the ALJ found that Adaire had the RFC to perform light and sedentary work subject to the following additional limitations: he should not climb or work at unprotected heights; should not perform over the shoulder reaching; should not perform repetitive bending or stooping; should not kneel or crawl; should not perform rapid repetitive hand movements; and he should only perform work that is unskilled and routine and repetitive in nature.  R. 627.  The ALJ relied on the findings of Drs. Galassi-Hudspeth Arjmand, Pardo, and Jimenez to support this finding. R. 630.

In making the RFC finding, the ALJ concluded that Adaire was not credible in his presentations to doctors or his testimony about the severity of the functional limitations caused by his pain.  The ALJ relied on statements in the medical records such as those by Dr. Traycoff that

Adaire's function was near normal when he left the doctor's office, by Dr. Fisk that Adaire had an exaggerated pain response, and by Dr. Warach that psychogenic factors were present.  The ALJ also noted that the objective medical test results and findings did not support the claimed level of pain.  The ALJ thus concluded that Adaire's statements about the severity of his pain or his functional limitations due to pain were not credible.  R. 628-29.

The ALJ did not give any weight to Dr. Smelter's letter in which Dr. Smelter state that Adaire was limited in the use of his right arm and was prevented from working.  The ALJ accepted the finding that Adaire's arm was impaired, but not to the degree that Dr. Smelter stated.  The ALJ also did not give controlling weight to Dr. Smelter's opinion that Adaire was limited to occasionally lifting ten pounds.  The limitation only related to his right arm; Dr. Smelter set no limitation on the use of the left arm.  The ALJ also found that Dr. Smelter's opinion was not supported by objective medical tests.  The ALJ concluded that Dr. Smelter's opinions were not entitled to controlling weight. R. 630-31.

At Step 4, the ALJ found that Adaire could not perform his past relevant work.  The ALJ relied on the RFC finding and the testimony of vocational expert Dr. Lanier.  R. 632.

At Step 5, the ALJ found that Adaire could perform a substantial number of jobs in the national economy. The ALJ relied on the Medical-Vocation Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. R. 632, and the testimony of Dr. Lanier that a person of Lanier's age, education, work experience, and RFC could perform the jobs of order clerk, ticket seller, and small package deliverer. Adaire, therefore, was not disabled. R. 633.

Adaire appealed the decision.

<u>After the Initial Decision</u>

On October 29, 2007, Adaire saw Robert Jones, PA, for low back pain. Jones was the physician's assistant for orthopedic surgeon Dr. Stephen Pineda, M.D. Adaire reported that he had experienced low back pain for several years. Adaire described the pain as achy, but became stabbing with sitting and standing. The pain was worse in the morning. He also reported right leg pain that started at the hip and radiated down to the knee. R. 706.

On examination, Jones observed that Adaire had normal and painless range of motion in his lumbar spine, hips, knees, and ankles. Adaire reported great pain on palpitation of the lumbar and thoracic spine. R. 707. Adaire's reflexes were depressed in his lower extremities and his

upper right extremity.  Jones could not examine Adaire's right upper

extremity because Adaire reported that it was too sensitive.  R. 707.

Jones's impression was low back pain.  Jones did not believe that Adaire

would be a good candidate for surgery for his low back.  R. 707.

On November 1, 2007, Adaire saw agency physician Dr. Vittal

Chapa, M.D., for a consultative examination.  R. 710-18.  Adaire reported

that he had lower back pain that radiated into his right leg, and was made

worse with movement.  Adaire also reported pain when sitting for long

periods of time.  Adaire also reported that he had pain in his right hand and

could not use his right hand.  He also reported that he had headaches

sometimes and ringing in his right ear.  R. 710.  Dr. Chapa found that

Adaire could bear weight and ambulate without any aids.  Dr. Chapa found

impaired right hand grip.  Adaire made a fist throughout the examination

and stated that he could not extend his right fingers.  Dr. Chapa found

atrophy of the right hand hypothenar muscles.  Adaire had decreased

pinprick sensation in the right fourth and fifth fingers.  Dr. Chapa stated that

Adaire could not perform either fine or gross manipulations with the right

hand.  Dr. Chapa found no impairments in the left hand.  R. 713.

Dr. Chapa found moderate paravertebral muscle spasms.  R. 713.

R. 751.  Dr. Chapa could not test the range of motion of Adaire's lumbosacral spine because Adaire reported that he could not bend forward. Straight leg testing was negative to 70 degrees.  Adaire exhibited limited range of motion in his hips and knees.  Adaire also reported pain and limited range of motion in his right shoulder.  R. 713.

Dr. Chapa noted in his summary that Adaire kept his right hand in a fist and would not use his right hand.  Dr. Chapa noted, "The claimant was very slow in his movements throughout the examination.  It was a very difficult examination."  R. 714.

On November 19, 2007, Adaire saw Dr. Pineda.  Dr. Pineda observed some straightening of the spine, but Adaire could stand; walk; and fire his hip, knee, and ankle flexors and extensors; and Adaire's sensation was intact.  Dr. Pineda advised against surgery and recommended pain management.  R. 705.

On November 28, 2007, a state agency psychologist, Dr. Margaret Wharton, Psy.D, completed a Mental Functional Capacity Assessment.  R. 719.  Dr. Wharton opined that Adaire's cognitive and attention skills were adequate for simple one-to-two step tasks, but his depression moderately limited his ability to carry out detailed tasks.  Dr. Wharton opined that Adaire's interpersonal skills were appropriate in a clinical interview, but he

described himself as socially withdrawn, so found that he had moderate limitations in social expectations.  R. 719.  Dr. Wharton opined that Adaire's adaptive skills were within normal limits.  R. 719.

On December 12, 2007, state agency physician Frank Jimenez, M.D., a Physical Residual Functional Capacity Assessment of Adaire.  R. 720-27. Dr. Jimenez opined Adaire could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for at least two hours in an eight-hour workday; could sit six hours in and eight-hour workday, but must alternate between sitting and standing; was limited in his ability push or pull with his upper extremities due to right ulnar neuropathy; could occasionally climb, stoop, crouch and crawl; could frequently balance and kneel; and could occasionally use his hand to perform gross and fine manipulations and feeling.  R. 720-27.

On December 17, 2007, a state agency found that Adaire was disabled.  The state agency made that decision as part of the adjudication of a second application for Disability Benefits that Adaire had filed.  The Appeals Council reopened and remanded the state agency's December 17, 2009, favorable determination along with the ALJ's July 23, 2007, unfavorable decision.  The two proceedings were consolidated on remand. R. 28.

On November 11, 2008, Adaire saw Dr. G. Leighton Wasem, LCPC, Ed.D., at the Mental Health Centers of Central Illinois, for an assessment. R. 730-36.  Dr. Wasem's "LCPC" designation stands for Licensed Clinical Professional Counselor.  See 225 ILCS 107/10.  Dr. Wasem noted that Adaire's speech was very slow and low.  R. 730.  Adaire reported that he was deeply depressed and highly anxious.  Adaire reported that he had ten panic attacks per month, and also heard voices that he could not understand, and saw images out of the corner of his eyes.  Adaire said that his symptoms worsened after an August 12, 2006, fire damaged his home and belongings.  Adaire said that his symptoms reached their worst levels in the summer of 2007.  Adaire reported increased back pain and migraines since 2000.  Adaire reported that he was fired in 2002 because of his deteriorating physical and emotional health.  R. 730.  Dr. Wasem assessed depressive disorder, generalized anxiety disorder, and panic disorder with agoraphobia.  He assigned Adaire with a Global Assessment of Functioning score of 35.  R. 735.  The assessment form in the record is unsigned.  R. 736.

On May 29, 2009, Dr. Wasem completed a medical source statement.  Dr. Wasem opined that Adaire had marked limitations in his ability to: (1) understand and remember simple instructions; 92) carry out

simple instructions; and (3) make judgments on simple work-related

decisions.  Dr. Wasem opined that Adaire had extreme limitations in his

ability to: (1) carry out complex instructions and (2) make judgments on

complex work-related decisions.  Dr. Wasem opined that Adaire's

limitations in his ability to understand and remember complex instructions

were more than marked, but less than extreme.  R. 738.  Dr. Wasem

explained,

> Jamie experiences chronic mid/low back pain, migraine
> headaches, loss of motion & very limited use of right arm &
> hand.  Right leg weakness & pain.  Panic attacks—about 4 per
> week, high anxiety, severe depression, auditory hallucinations
> & passive & frequent SI.

R. 738.  Dr. Wasem opined that Adaire's ability to deal with others was

similarly limited due to the same factors.  Dr. Wasem opined that Adaire

could stand for ten minutes; was extremely limited in his ability to walk and

sit; and was extremely limited in his ability to use his fine motor skills.  R.

739.

On June 3, 2009, the ALJ conducted an evidentiary hearing on the

consolidated proceedings.  R. 795-827.  Adaire appeared in person and

with his attorney.  Vocational expert Bonnie Gladden also appeared.

Adaire testified that his condition had gotten worse since the last

hearing.  He had more weakness, and "the pain is a little greater, not much

greater, but it's greater."  R. 803.  He testified that he more migraines and panic attacks.  R. 803.

Adaire testified that he had numbness on his right side.  He testified that his right arm was weak and numb.  He testified that he could not use his right arm and fingers.  He testified that he did everything with his left hand.  He testified that the pain and weakness extended into his right leg. R. 804-05.  Adaire testified that he had trouble walking.  He held on to "stuff around the house" to walk at his residence.  R. 805.  He did not have a cane because he did not go anywhere outside of his house.  R. 805.  His girlfriend drove him to the hearing and helped him walk from the car to the hearing room.  R. 806.

Adaire testified that he no longer drove because of the migraines.  He stated that the stress of driving would trigger a migraine and then he could not see.  R. 806.  He testified that he had not driven in a year or more.  R. 821.  He still had a driver's license, though.  R. 821.  Adaire testified that he had four or five migraine headaches a week.  R. 806.  He testified that when he got a migraine he had to avoid light and lie down most of the day. R. 807.

Adaire testified that he got panic attacks about four times a week.  He said that "any thoughts of stress" might cause a panic attack.  R. 808.  He

said answering the phone or having the letter carrier ring the doorbell could cause a panic attack.  He testified that his girlfriend or his son answered the phone or the door.  R. 808-09.

Adaire testified that he lived with his girlfriend and their three children, ages 20, 10, and 6.  Adaire testified that he did not take care of the children.  R. 810.  He testified that his 20 year old son and his girlfriend took care of the other children.  His son worked nights, and so, was home when the children got home from school, and his girlfriend worked evenings, and was home in the morning.  A friend of his girlfriend and a grandmother also helped take care of the children.  R. 823-24.

Adaire testified about his trip to his mother's home in Missouri.  He testified about that trip at the previous hearing.  He testified at this hearing that he took the trip because his home had been damaged in a fire and he had no place to stay.  R. 810.

Adaire testified that he lost his last job because he could not concentrate, could not take directions, and could not perform the required tasks because of weakness.  He fell asleep at the job when he was cooking something and burned up the food.  Adaire also testified that he did not get along with his employer or the other employees.  He testified that he always had trouble with strangers.  R. 811-12.

Adaire testified that he could sit comfortably for twenty to thirty minutes, walk 200 feet, and lift five pounds.  He testified that he could not lift more than five pounds even with his left hand because of the stress on his body.  R. 814.  He testified that he did everything with his left hand.  R. 815.

Adaire testified that his medication caused dizziness, nausea, and fatigue.  He testified, though, that he would be in too much pain if he did not take the medication.  R. 816.

Adaire testified that he spent most of the day in his bedroom.  He said that there was too much light and too much noise in the rest of the house. He testified that lying in bed relieved the pain.  He testified that he also took baths to relieve the pain.  He testified that he ate alone in his bedroom rather than with the family because of the noise and light.  R. 817.  Adaire testified that he left the house about once a month to see the doctor.  His girlfriend did all the shopping.  R. 817-18.

Adaire testified that he heard things, mostly at night.  He testified that he heard voices.  He testified that "it sounds like it's, you know, somebody in the room with me."  R. 818.

Vocational expert Gladden then testified.  Counsel for Adaire asked Gladden the following question:

Ms. Gladden, the question would be with taking a hypothetical person given the same age, education and work experience as Mr. Adaire. This person would be able to lift 10 pounds on occasion and five pounds or less—or lift and carry five pounds or less. This would including (sic) picking things up—upward and in an upward direction or pulling. Person would also be limited in reaching in all directions, limited in handling, limited in fingering. This person would also have a marked difficulty understanding and remembering simple instructions, marked difficulty in carrying out simple instructions, he would have a marked ability to make judgments on simple work-related directions, and have extreme difficulty in carrying out complex instructions or making complex work decisions. Person would further have a marked disability, meaning again, this is a serious limitation, substantial loss in the ability to effectively function, a mark disability to interact appropriately with the public or supervisors, even more so, more than marked, but less than extreme with coworkers. And an extreme disability in responding appropriately to usual work situations and changes in routine. This person's standing time due to his impairment would be less than—10 minutes or less. Walking would be slow and limited in distance. Back pain would be exasperated—exacerbated, I'm sorry—by sitting. And having an extreme limitation as we—as I mentioned about feeling and handling with [phonetic] his fine motor coordination. In your opinion, Ms. Gladden, are there jobs that may be available to a person with those disabilities in the national workforce?

R. 825-26. Gladden responded, "I would find it extremely difficult to find a number of jobs. . . . I cannot really come up with any jobs." R. 826-27. The ALJ did not have any questions for Gladden. The hearing then concluded. R. 827.

On July 9, 2009, Dr. Warach conducted a consultative examination at the request of the ALJ. R. 777. Adaire was properly oriented. His speech

was slow but fluent.  Adaire had decreased pin, cold, vibration, and light touch sensation involving the entire right side of his body.  Adaire could not perform finger-to-nose maneuvers with his right arm.  Dr. Warach did not observe any tremors, seizures, or abnormal involuntary movements. Adaire was unable to stand unassisted for Romberg testing.  Adaire had slow and wide-based ambulation, and dragged his right leg.  Adaire's right side motor strength was 3/5 and he held his right hand in a fist.  Dr. Warach found tenderness on percussion over the lumbosacral spine. Tinel's signs were negative bilaterally.   Straight leg testing was negative bilaterally. Adaire had normal tone in all four extremities.  R. 777-78.

Dr. Warach diagnosed mild abulia, memory difficulty, generalized bradykinesia, right side sensory loss, right hemiparesis with giveaway weakness and gait difficulty, history of chronic right-sided symptoms, history of chronic lumbosacral and right lower extremity pain and history of migraine headache syndrome.  Dr. Warach noted "psychogenic factors may be highly contributory to his presentation."  R. 778.

On October 2, 2009, Dr. Smelter wrote a letter about his past assessments of Adaire's limitations at the request of the ALJ.  Dr. Smelter wrote,

> Yes, the limitations I indicated are based solely on my
> diagnosis of right ulnar neuropathy.  In my opinion, the

claimant's alleged limitations with his right hand/arm were due to his unwillingness to do so when examined.  I am able to identify muscle atrophy from disuse.  The patient does not have a left arm impairment that would prevent lifting greater than five pounds.  The patient claims his right leg is weak with findings of straight leg raising is positive on the right.  There is no motor loss in his right leg but there is motor loss in his right hand.  Both of the patient's calves measure 12 inches.  The patient's forearms measure 9 ¾ inches on the right and 10 inches on the left.  The patient's medical diagnosis is sympathetic dystrophy.

R. 780.

## The Decision of the ALJ on Remand

On November 23, 2009, the ALJ issued her decision on remand of the consolidated proceedings.  R. 28-45.  The ALJ again followed the Social Security Administration 5-Step Analysis.  R. 29.  The ALJ determined that Adaire met his burden at Steps 1 and 2.  Adaire had not engaged in substantial gainful activity since July 1, 2002, and he suffered from severe impairments due to scoliosis (post corrective surgery in 1983 with residual back pain); right cubital tunnel syndrome (post corrective surgery); headaches, depression, anxiety and somatization disorder.  R. 30.  The ALJ again found that Adaire's impairments or combinations of impairments did not meet or equal a Listing.  The ALJ again considered Listings 1.02, 1.03, 1.04, 12.04, 12.06, and 12.07.  R. 31.

At Step 4, the ALJ found that Adaire found that Adaire had the RFC to perform light and sedentary work subject to the following additional

limitations: he should not climb or work at unprotected heights; should not

perform over the shoulder reaching; should not perform repetitive bending

or stooping; should not kneel or crawl; should not perform rapid repetitive

hand movements; and he should only perform work that is unskilled and

routine and repetitive in nature.  R. 32.

The ALJ relied on the opinions of Drs. Galassi-Hudspeth, Pardo,

Arjmand, Wharton, and Jimenez in making the RFC finding.  The ALJ again

found that Adaire's testimony and statements to doctors about the severity

of his impairments due to pain was not credible.  The ALJ relied on the

statement by Dr. Fisk that Adaire had an exaggerated pain response; the

report to Dr. Fisk in 2000 that his back pain was 95% better after the

automobile accident; the statement by Dr. Traycoff that Adaire had an

unusual affect and that Adaire function was near normal when he left Dr.

Traycoff's office; the opinions of Drs. Pardo, Arjmand and Jimenez that

indicate that Adaire was not as limited as he claimed; and objective tests

results that did not show a cause for Adaire's claimed level of pain and

impairment.  R. 35.

The ALJ relied on Dr. Smelter's October 2, 2009, letter to find that Dr.

Smelter's diagnosis and opinions were not based on objective findings, but

subjective statements of Adaire's.  The ALJ did not give controlling weight

to Dr. Smelter's opinions because they were not supported by objective medical evidence and were inconsistent with other evidence in the record. R. 37.

The ALJ rejected Dr. Wasem's opinions because he was not a medical doctor and did not base his opinions on objective medical evidence.  The ALJ also noted that Dr. Wasem's opinions were inconsistent with the opinions of Drs. Pardo, Arjmand, and Jimenez who assessed Adaire's functional capacity.   R. 38.

Based on the RFC finding and the opinions of Dr. James Lanier, the ALJ found at Step 4 that Adaire could not return to his prior work.  At Step 5, the ALJ found that Adaire could perform a significant number of jobs in the national economy.  The ALJ again relied on the Medical-Vocational Guidelines and the opinions of the vocational expert Dr. Lanier.  R. 44.

Adaire appealed this decision.  On March 25, 2011, the Appeals Council denied Adaire's request for review.  The November 23, 2009, decision of the ALJ then became the final decision of the Commissioner. R. 17.  Adaire then brought this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the

Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ's decision is supported by substantial evidence.  The opinions of Drs. Galassi-Hudspeth and Wharton support finding that Adaire did not meet a Listing for mental impairments, and the medical evidence supports the findings Adaire did not meet a Listing for physical impairments based on his back or right extremity.  The opinions of Drs. Galassi-Hudspeth and Wharton also support the ALJ's RFC determination that Adaire's mental limitations would allow him to perform simple repetitive jobs.  The opinions of Drs. Pardo, Arjmand, and Jimenez support the ALJ's RFC finding that Adaire could perform light or sedentary work subject to the

postural limitations and the limitations in the use of his right extremity.  The

opinions of vocational expert Dr. Lanier supports the findings at Step 5 of

the Analysis that Adaire could perform a substantial number of jobs in the

national economy.  Dr. Lanier specifically opined that a person could

perform the jobs he listed (surveillance monitor, ticket checker, information

clerk, ticket seller, and small package deliverer) with either hand and did

not require the use of the dominant hand.  Dr. Lanier also testified that the

sedentary jobs he listed could be performed by a person who had to

alternate at-will between sitting and standing.  R. 855-87.  Dr. Lanier's

testimony provides substantial evidence to support the ALJ's finding at

Step 5 that Adaire could perform a significant number of jobs in the national

economy.

The ALJ's decision not to give controlling weight to the opinions of Dr.

Smelter is also supported by substantial evidence.  A treating physician's

medical opinion is entitled to controlling weight when it is well supported by

medically acceptable clinical and diagnostic techniques and is reasonably

consistent with the other substantial evidence in the record.  20 C.F.R. §

404.1527(d)(2); SSR 96-2p.  The ALJ, however, "need not accept the

opinion of a physician, including a treating physician, if that opinion is brief,

conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (7th Cir. 2002).

In this case, Dr. Smelter opined that Adaire could not work because he was limited in his use of his right arm. Objective medical evidence supported the finding that Adaire's right arm was impaired by his cubital tunnel syndrome, but objective medical evidence did not support Dr. Smelter's conclusion that Adaire could not work because of work because of that limitation. As the ALJ correctly pointed out, Dr. Smelter did not find that Adaire had any limitations in the use of his left arm. The vocational expert Dr. Lanier opined that the jobs he listed could be performed with either hand and did not require the use of the dominant arm or hand. Thus, Dr. Smelter's opinions were inconsistent with other evidence in the record.

Dr. Smelter also stated in the October 2, 2009, letter that his opinions were based on Adaire's unwillingness to use his arm when being examined. This letter further supports the ALJ's conclusion that Dr. Smelter's opinions were not based on objective medical evidence and were not entitled to controlling authority.

The ALJ also did not err in rejecting the opinions of Dr. Wasem because Dr. Wasem is not an acceptable medical source. An acceptable medical source is a medial or osteopathic physician, licensed psychologist,

licensed optometrist, or a licensed speech-language pathologist.  20 C.F.R.

§§ 404.1513(a) and 416.913(a).  Dr. Wasem was a licensed professional

counselor, not a licensed psychologist.  Furthermore, Dr. Wasem opined

about Adaire's physical impairments.  Even if he were a licensed

psychologist, Dr. Wasem would not be qualified to opine on Adaire's

physical impairments.  Dr. Wasem's opinions about Adaire's physical

functional limitations were inconsistent with the opinions of Drs. Pardo,

Arjmand, and Jimenez, and his opinions about Adaire's mental functional

limitations were inconsistent with the opinions of Drs. Galassi-Hudspeth

and Wharton.  The ALJ's decision to reject Dr. Wasem's opinions,

therefore, was supported by substantial evidence.

Adaire argues that the decision should be reversed because the ALJ

was biased against him.  Adaire fails to prove his claims of bias.  Adaire

must meet a heavy burden of proof to establish bias, "[W]e begin with the

presumption that the ALJs are impartial, and to overcome that presumption,

a claimant must show that the ALJ 'displayed deep-seated and unequivocal

antagonism that would render fair judgment impossible.'"  Martin v. Astrue,

345 Fed.Appx. 197, 202 (7th Cir. 2009) (quoting Liteky v. United States, 510

U.S. 540, 556 (1994).  Adaire presents no evidence of any antagonism

toward him.  The ALJ did not find Adaire credible, but she based that

conclusion on the comments of doctors in the record and her own observations of Adaire at the hearings.  The Court sees no evidence of bias.

Adaire next argues that the ALJ erred in her credibility finding regarding Adaire's testimony about the severity of his pain.  He argues that the ALJ should be required to state clear and convincing reasons for her finding that Adaire's testimony about the level of his pain was not credible. Adaire relies on <u>Cotton v. Bowen</u>, 799 F.2d 1403, (9th Cir. 1986), and later Ninth Circuit decisions that follow <u>Cotton</u>.  E.g., <u>Orteza v. Shalala</u>, 50 F.3d 748, 749-50 (9th Cir. 1995); <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345-46 (9th Cir. 1991).

This Court must follow the decision of the Seventh Circuit Court of Appeals rather than the Ninth Circuit.  The Seventh Circuit has not adopted the Ninth Circuit's requirement that the ALJ must state clear and convincing reasons.  The Seventh Circuit directs this Court to give substantial deference to the ALJ's credibility finding.  <u>E.g.</u>, <u>Sienkiewicz v. Barnhart</u>, 409 F.3d 798, 803 (7th Cir. 2005).   The Seventh Circuit explained,

> Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying.  Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.

Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006) (citations omitted).  The

Seventh Circuit, therefore, does not impose on the ALJ the obligation to

present clear and convincing reasons for a credibility determination.

Rather, the Seventh Circuit directs this Court to uphold the ALJ's credibility

determinations unless the determinations lack any explanation or support in

the record.  Elder, 529 F.3d at 413-14.

In this case, the ALJ's credibility determination is supported by

evidence in the record.  The credibility finding is supported comment by Dr.

Fisk that Adaire had an exaggerated pain response. The finding is also

supported by Dr. Traycoff's observation that Adaire had near normal

function when he left the office that was inconsistent with his presentation

at the examination.  The ALJ's determination is also supported by the lack

of objective medical evidence that would normally exist with the claim level

of pain and dysfunction.  See Sienkiewicz, 409 F.3d at 804 ("[A]

discrepancy between the degree of pain claimed by the applicant and that

suggested by medical records is probative of pain exaggeration.").  The

ALJ's credibility determination is supported by substantial evidence.

Adaire complains that the ALJ did not address vocational expert

Gladden's response to the hypothetical questions posed by Adaire's

attorney.  Adaire's attorney posed a question based on the opinions of Dr.

Page **38** of **40**

Wasem.  As explained above, the ALJ's decision to reject Dr. Wasem's opinions is supported by substantial evidence.  The decision not to consider Gladden's opinion testimony based on those opinions, thus, is also supported by substantial evidence.  Dr. James Lanier's testimony at the first hearing also supported the ALJ's decision.  The ALJ, therefore, did not err in choosing not to discuss Gladden's testimony.

Adaire argues that the ALJ failed to adequately develop the record because she did not consider the opinions of Dr. Linda Lanier and Dr. Chapa.  The Court disagrees.  The ALJ specifically relied on the opinions of state agency physicians and psychologists.  Agency psychologist Dr. Galassi-Hudspeth considered the examination of Dr. Lanier in preparing her mental residual functional assessment of Adaire.  R. 549-52, 561-74.  Similarly, agency physician Dr. Jimenez considered Dr. Chapa's examination in preparing his second residual physical assessment.  R. 720-27.  The ALJ, thus, adequately considered these examinations.  The Court sees no error.

WHEREFORE this Court recommends that Adaire's Motion for Summary Judgment (d/e 19) should be DENIED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e21)

should be ALLOWED, and the decision of the Acting Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.


ENTER:   April 30, 2013


_____s/ Byron G. Cudmore_____
UNITED STATES MAGISTRATE JUDGE